UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH CARLOTTI,<br><br>              Plaintiff,<br><br>     v.<br><br>ASUS COMPUTER INTERNATIONAL, et al.,<br><br>              Defendants. | Case No. 18-cv-03369-DMR<br><br>**ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Re: Dkt. No. 59 |

On May 4, 2018, Plaintiff Joseph Carlotti filed a class action complaint in Alameda County Superior Court against Defendants ASUS Computer International ("ACI") and ASUSTek Computer Inc. ("ASUSTek"). [Docket No. 1-1 ("Compl.").] ACI removed the action to this court on June 7, 2018 under the Class Action Fairness Act. [Docket No. 1.] The parties seek preliminary approval of a class action settlement. [Docket No. 59 ("Mot.").] The court held a hearing on August 22, 2019. Following the hearing, court ordered the parties to submit additional briefing, which they submitted on September 12, 2019 and October 7, 2019. [Docket Nos. 68 ("Supp. Br."); 68-1 ("Gutride Supp. Decl."), Ex. A ("Agreement").]

For the reasons stated below, the motion for preliminary approval is granted.

I.    **BACKGROUND**

A.    **Facts and Claims**

Carlotti alleges that Defendants manufactured and sold two laptop models that contain defects: the ASUS GL502VS ("VS") and the ASUS GL502VKS ("VKS"). These models were allegedly advertised as "portable laptops with a powerful graphical processor suited for gaming and video editing." Compl. ¶ 2. However, according to Carlotti, the laptop models contain two main defects that render them inadequate for these processes. *Id.* ¶ 1. First, the laptops allegedly have

several issues relating to their power supply units, including: (1) the battery drains during use, even when connected to a power outlet; (2) there are "significant reductions in computational performance" when the battery power is low; and (3) there is accelerated degradation of the batteries ("Power Defect"). *Id.* ¶ 2. Second, Carlotti claims that the laptops' cooling system is insufficient to prevent overheating, leading to reduced durability and performance ("Overheating Issue"). *Id.* ¶ 6.

The operative complaint proposes a class of "[a]ll persons in the United States who purchased one or more ASUS GL502VS or GL502VSK laptops." Compl. ¶ 83. The California Subclass includes "[a]ll members of the Class who made their purchase in California." *Id.* On behalf of the putative class and subclass, Carlotti brings numerous claims for relief, including: (1) breach of express warranty; (2) breach of the implied warranty of merchantability; (3) violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*; (4) deceit and fraudulent concealment; (5) unjust enrichment; (6) violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*; (7) violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500; (8) violations of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790 *et seq.*; and (9) violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

### B. Procedural History

Carlotti represents that the parties "conducted a thorough examination and investigation of the facts and law relating to the matters in the Litigation." Mot. at 2. Class counsel engaged in pre-litigation investigation and discovery, including researching Defendants' marketing and advertising, reviewing Carlotti's documentation, and analyzing the information available on Defendants' websites. [Docket No. 61 ("Gutride Decl.") ¶ 4.] Carlotti filed the complaint in Alameda County Superior Court on May 4, 2018. *Id.* ¶ 2. Defendant ACI removed the case to this district on June 7, 2018. *Id.* ¶ 5. Carlotti filed a motion for alternative method of service on ASUSTeK, a Taiwanese corporation, which the court granted on February 11, 2019. [Docket Nos. 39, 42.]

Class counsel represents that they engaged in meet-and-confer efforts with Defendants' counsel throughout the case, including the scope of discovery, the retention and production of electronically stored information, the terms of a protective order, and the timing of production and

depositions. Gutride Decl. ¶ 7. Carlotti propounded written discovery, including requests for production of documents and interrogatories. *Id.* ¶ 8. Defendants produced hundreds of documents, and class counsel retained an electrical engineering expert to assist in reviewing Defendants' production. Docket No. 63 ("Sacks Decl.") ¶ 14; Gutride Decl. ¶ 9. Defendants deposed Carlotti on November 14, 2018. Gutride Decl. ¶ 10. On March 19, 2019, the parties held a mediation before Martin Quinn, Esq. at JAMS. *Id.* ¶ 12. The case settled as a result of the mediation, and there has been no briefing or hearing for summary judgment or class certification.

The court held a hearing on August 22, 2019. Following the hearing, court ordered the parties to submit additional information about the proposed settlement. [Docket No. 65.] The parties submitted supplemental briefing on September 12, 2019 and October 7, 2019.

## II.    TERMS OF THE SETTLEMENT

The following description of the Agreement includes the changes implemented after the hearing.[1] Under the terms of the Agreement, Defendants will provide an extended warranty ("Extended Warranty") on all VS laptops to cover certain repairs, which include repairs to or replacement of a motherboard and/or a new AC power adapter ("Qualifying Repairs"). Agreement ¶¶ 2.48, 5.1. The Extended Warranty will last until the latest of (1) three years from the date of purchase; (2) 90 days after final approval of the class action settlement; or (3) 180 days after the date Defendants previously replaced the internal power supply and/or AC power adaptor. *Id.* ¶ 5.1. The value of the Extended Warranty is estimated at $16,110,225.00. Supp. Br. at 9.

Additionally, all class members are entitled to submit a claim for monetary relief, including those who are eligible for Qualifying Repairs under the Extended Warranty. The amount of the settlement benefits is not limited by the number of claims submitted or any fees or costs in the case, all of which are covered by Defendants. The amount of benefits to which each class member is entitled depends on (1) whether the class member previously complained about one of the defects addressed in this case and (2) the proof of purchase:

---

[1] All references to the Agreement throughout this order refer to the amended Agreement attached as Exhibit A to the Gutride Supplemental Declaration.

- **Group A** includes class members who registered their laptop with Defendants, bought the laptop from the ASUS website, or can submit a proof of purchase. Members of this group who submit a claim have the option to select either a $110 cash payment or a $210 credit certificate, which is freely transferable, stackable, and is valid for at least two years. Agreement ¶ 6.1(a).

- **Group B** includes class members who previously complained to Defendants about the defects. Members of this group will automatically receive a $210 credit certificate without filing a claim. Members can elect to file a claim instead and receive a $110 cash payment. *Id.* ¶ 6.1(b). The parties represent that fewer than 500 people qualify for Group B.

- **Group C** includes any other member of the class (i.e., those that do not have the proof required to be in Group A or did not file a prior complaint to qualify for Group B). Although this group does not have to submit the proof that is required to be part of Group A, they still must provide the serial number of their laptops. Members of this group have the option to submit a claim for either a $55 cash payment or a $105 credit certificate. *Id.* ¶ 6.1(c).

The highest potential monetary value of the settlement is $5,208,000. *See* Docket No. 62 ("Nafisi Decl.") ¶ 19. For Group A claims only, Defendants retain the right to demand an inspection of a laptop to verify that it suffers from either defect. Members of any Group must certify under penalty of perjury that their laptop suffered from the Power Defect and/or Overheating Issue. *See* Agreement, Ex. A, A1.

The parties propose that Angeion Group act as the settlement administrator. Class members will be notified by email if Defendants have an email address for them; by postcard via First Class U.S. Mail if Defendants have their physical address but not an email address; and by both email and postcard if Defendants have an email address and a physical mailing address. Agreement ¶ 7.2(b). If a physical mailing is returned as undelivered, then the claims administrator will use a skip trace search to identify updated mailing addresses. *Id.* ¶ 7.2(e). Notice will also be published in People magazine and USA Today, and will be distributed via press release. *See id.* ¶ 7.2(i); Mot. at 9. There will also be an online notice published across internet websites and social media platforms, and an online notice on Defendants' websites and social media platforms. Agreement ¶ 7.2(h). This media notice procedure is expected to reach 76.75% of the target audience with an average frequency of 3.03 times each. [Docket No. 60 ("Weisbrot Decl.") ¶¶ 22-23.] The claims

administrator will launch a settlement website.  *Id.* ¶ 7.2(f).

Carlotti's counsel will seek approval of an award of costs and fees in the amount of $787,500.00 after the class members are notified and have the opportunity to opt out of the settlement or object.  Agreement ¶ 2.4.  Carlotti will seek an incentive award of $5,000.  *Id.* ¶ 2.29.

## III.    PRELIMINARY APPROVAL

"The Ninth Circuit maintains a 'strong judicial policy' that favors the settlement of class actions."  *McKnight v. Uber Techs., Inc.*, No. 14-cv-05615-JST, 2017 WL 3427985, at *2 (N.D. Cal. Aug. 7, 2017) (quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)). The settlement of a certified class action must be "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  "The court's role in reviewing a proposed settlement is to represent those class members who were not parties to the settlement negotiations and agreement."  *Tadepalli v. Uber Techs., Inc.*, No. 15-cv-04348-MEJ, 2016 WL 1622881, at *6 (N.D. Cal. Apr. 25, 2016).  At the preliminary approval state, the court's role is to assess whether the settlement "falls within the range of possible approval."  *Terry v. Hoovestol, Inc.*, No. 16-cv-05183-JST, 2018 WL 4283420, at *1 (N.D. Cal. Sept. 7, 2018) (internal quotation marks and further citations omitted).

The court will look to two authorities in deciding whether to grant preliminary approval: (1) the fairness factors set forth in *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); and (2) the factors in Rule 23(e)(2).  "The relative degree of importance to be attached to any particular factor will depend upon . . . the unique facts and circumstances presented by each individual case."  *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).  The court will also consider the Northern District of California's Procedural Guidance for Class Action Settlements.[2]

### A.    *Churchill* Factors

A class action "may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  The "decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is exposed to the litigants, and their strategies,

---

[2] Available at https://www.cand.uscourts.gov/ClassActionSettlementGuidance.

positions, and proof." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), *as amended* (June 19, 2000) (citation omitted). The district court's role in reviewing proposed class action settlements is to determine whether a settlement is "fundamentally fair, adequate, and reasonable." *Id.* The court is tasked with balancing a number of factors, including:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill*, 361 F.3d at 575.

### 1.     Strength of Plaintiff's Case and Risks of Litigation

The first three factors are addressed together and require the court to assess the plaintiff's "likelihood of success on the merits and the range of possible recovery" versus the risks of continued litigation and maintaining class action status through the duration of the trial. *See Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-cv-1365-CW, 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010). However, the court need not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice*, 688 F.2d at 625. These factors weigh in favor of approving settlement when the defendant has "plausible defenses that could have ultimately left class members with a reduced or non-existent recovery." *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 999 (N.D. Cal. 2015).

The complaint in this case alleges various breach of warranty and false advertising claims based on the alleged defects in the two ASUS laptop models at issue. While Carlotti and his counsel assert that the claims are meritorious, they concede that several issues in the case could possibly result in little or no recovery on a class-wide basis, including the difficulty of proving:

> (1) that all the Laptops uniformly experienced the Power Defect and Overheating Issues, (2) that Defendants' marketing materials were likely to deceive reasonable consumers, (3) that omissions in the marketing materials were material to reasonable consumers, (4) the amount of damages or restitution due to the class or to any class member, and (5) that common questions predominate over individual issues such that a class may be

certified.

Mot. at 14.  Adam Gutride, one of Carlotti's counsel, identified additional arguments raised by Defendants:

> (a) Plaintiff could not identify any actionable misrepresentation or omissions, as opposed to inactionable puffery, regarding the Laptops; (b) Plaintiff lacked standing to assert claims related to the GL502VS Laptops (because he purchased a GL502VSK Laptop); (c) there was no defect in the GL502VSK Laptops; (d) Plaintiff's common law fraud claims are barred by California's economic loss rule; (e) there was no breach of express warranty because the written warranty did not cover design defects, ASUS complied with its warranty by replacing Plaintiff's laptop, and there was no other express warranty; (f) there was no unfair or unlawful conduct; (g) Plaintiff could not certify a class because individualized questions of materiality, reliance, and injury would predominate; and (h) Plaintiff and the Class suffered no damages because the Laptops performed as well as, or better than, other laptops in the market.  In support of those arguments, Defendants argued that GL502VS and GL502VSK Laptop models differed in material respects. ASUS conceded that it received some complaints from GL502VS Laptop purchasers about the Power Defect and Overheating Issue, but ASUS claimed that it addressed the problem by designing the next model (the GL502VSK) with an upgraded power adapter and a different CPU and motherboard, which allegedly resolved the defects identified by Plaintiff. ASUS claimed that the Power Defect and Overheating Issue only affected 2% of the GL502VS laptops and .5% of the GL502VSK laptops.

Gutride Decl. ¶ 15.  Carlotti also asserts that even if the class prevails at trial, the court could "require an individualized damage prove-up," which would be far more time-intensive and costly than the relatively simple claims process outlined in the settlement.

The record establishes that there is significant risk to individual and class recovery if the case were to proceed further in litigation.  If Defendants were able to show, for example, that they complied with Carlotti's warranty by replacing his laptop, then Carlotti may lack standing to represent the class for the warranty claims.  *See* Gutride Decl. ¶ 15.  Further, even if the class were certified, Defendants could still move to decertify the class at any time. *See In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18, 2013) ("The notion that a district court could decertify a class at any time is one that weighs in favor of settlement.").

Weighing the potential benefits to the class against the risks of continued litigation, the court finds that first three *Churchill* factors support approving the settlement.

//

7

## 2.    Amount Offered in Settlement

The fourth *Churchill* factor, which looks at the amount of recovery offered in settlement, favors preliminary approval. When considering whether the amount offered in settlement is fair and adequate, "[i]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Officers for Justice*, 688 F.2d at 628. In addition, "it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004).

In this case, the Agreement entitles all class members to submit a claim for monetary relief. The amount of the settlement benefits is not limited by the number of claims submitted or any fees or costs in the case, all of which are covered by Defendants. The amount of benefits any class member can receive depends on whether they previously complained about one of the defects at issue in this case and the proof they have relating to their purchase. Class members in Group A and B have the option of receiving either a $110 cash payment or a $210 credit certification, while class members in Group C can receive either a $55 cash payment or a $105 credit certificate. Carlotti represents that approximately 24,800 laptops were sold during the class period. Mot. at 7. The maximum (albeit theoretical) monetary recovery under the settlement is $5,208,000.

Class members are entitled to receive injunctive relief in addition to the monetary recovery. The Extended Warranty covers repairs relating to the Power Defect to the VS laptops, of which approximately 13,500 were sold during the class period. Nafisi Decl. ¶ 18. In the initial motion, counsel estimated that cost of repair for the Power Defect in the VS laptops would be approximately $500 per laptop. *Id.* In the supplemental papers, this figure was amended. *See* Docket No. 68-3 ("Morquecho Decl.") ¶¶ 2-3. The current cost of replacing an original motherboard in a VS laptop without a warranty is $1,153.63. *Id.* ¶ 2. The current replacement cost for a VS power adapter is $39.72. *Id.* ¶ 3. If all class members who purchased a VS laptop during the class period received both repairs, the monetary value of the repairs would be 13,500*($1,153.63+$39.72) = $16,110,225. In total, the Agreement provides monetary and equitable relief with an estimated maximum value of over $21.3 million.

At the hearing, the court asked what relief the class would receive if they prevailed. Class counsel responded that the damages for the false advertising claims would likely be calculated based on the premiums that class members paid for laptops that were advertised to perform high capacity functions such as gaming and video editing. The premiums are the difference in price between the laptops at issue (approximately $1,700) and laptops that could not perform the high capacity functions. Class counsel estimated the premiums would be 2-5%, or $34-85 per laptop. Because this claim would affect all members of the class, which is estimated to include approximately 24,800 members, the total monetary recovery for the false advertising claims is estimated to be between $843,200 ($34x24800) and $2,108,000 ($85x24,800).

For the warranty claim, class counsel represented that damages would likely be calculated based on the cost of repair. In the initial motion, counsel estimated that cost of repair for the Power Defect in the VS laptops would be approximately $500 per laptop. Nafisi Decl. ¶ 18. In the supplemental papers, this figure was amended to $1,193.35 (assuming that the laptop was no longer covered by a warranty). *See* Morquecho Decl. ¶¶ 2-3. Unlike the false advertising claim, however, the warranty claims would affect only those class members whose laptops experienced the defects, which they estimate as about 2% of the class (approximately 500 people). Based on this estimate, the total value of the warranty claim would be about $596,675. In total, the estimated maximum recovery for the class if they prevailed would be $2,704,675, which is a fraction of the estimated settlement value.

The total potential settlement value does not reflect the realistic value of the settlement because most of that number is based on the value of the Extended Warranty without considering the relatively low percentage of the class who experienced the defects. However, looking at the relief provided to any individual class member, the amount offered in the settlement appears reasonable. Anyone who bought a VS laptop with a Power Defect[3] would be entitled to receive a

---

[3] At the hearing, the court asked whether the Extended Warranty addressed the Overheating Issue as well as the Power Defect. Class counsel responded that the repairs principally address the Power Defect. They explained that gaming laptops often experience overheating issues and the constraints of laptop design do not allow that issue to be fully remedied. Based on the information provided by counsel, the court infers that the primary concern in this case is seeking damages due to the Power Defect. The court also asked why there was no Extended Warranty for repairs to the VSK. The

full repair of the issue through the Extended Warranty (valued at $1,193.35), and between $55 and $210 in monetary benefits in addition to the repairs. Therefore, class members who were affected by the defects can receive a full equitable remedy in the form of repairs while still recovering a significant monetary benefit.

The court finds that the relief offered is closely tailored to address the alleged wrongful conduct and is within the realm of reasonable recovery in this case.

### 3. Stage of Proceedings

Class settlements are presumed fair when they are reached "following sufficient discovery and genuine arms-length negotiation." *DIRECTV*, *Inc.,* 221 F.R.D. at 528; 4 Newberg at § 11.24. "The extent of discovery [also] may be relevant in determining the adequacy of the parties' knowledge of the case." *DIRECTV*, 221 F.R.D. at 527 (quoting *Manual for Complex Litigation, Third* § 30.42 (1995)). "A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Id.* (quoting 5 *Moore's Federal Practice*, §23.85[2][e] (Matthew Bender 3d ed.)). However, "[i]n the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, 'formal discovery is not a necessary ticket to the bargaining table.'" *Wilson v. Tesla, Inc.*, No. 17-cv-03763-JSC, 2019 WL 2929988, at *8 (N.D. Cal. July 8, 2019) (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)).

Carlotti represents that the parties "conducted a thorough examination and investigation of the facts and law relating to the matters in the Litigation." Mot. at 2. They state that they conducted "an in-depth technical analysis of the issue that involved surveying and interviewing dozens of affected consumers, reviewing hundreds of online posts, and developing a detailed understanding of ASUS's representations and remediation attempts." Nafisi Decl. ¶ 3. Carlotti's counsel hired an

---

parties represented that Defendants manufactured the VSK in part to remedy the Power Defects in the VS model, and so the Extended Warranty repairs to the VS laptops would essentially make them function like a VSK. Because there were substantially fewer complaints from consumers about power issues with respect to the VSK, the parties state that the repairs are not necessary for that model.

electrical engineering expert and engaged in extensive pre-litigation investigation and discovery. *Id.* Carlotti appeared for a deposition. *Id.* On March 19, 2019, the parties participated in an all-day mediation conducted by Martin Quinn, of JAMS. The case settled as a result of the mediation, and there has been no briefing or hearing for summary judgment or class certification. Luanne Sacks, lead counsel for Defendants, also testifies that the parties engaged in significant discovery. Sacks Decl. ¶ 14. She states that Defendants deposed Carlotti, responded to his interrogatories and document requests, and produced hundreds of pages of documents. *Id.* She also avers that they were in the process of scheduling the deposition for ACI's Rule 30(b)(6) witness immediately prior to the settlement. *Id.*

At the hearing, the court noted that there was a limited amount of written discovery propounded in this case and that the number of documents ("hundreds") seemed low for a consumer class action. The court also noted that the case was settled early and without substantial litigation. Class counsel represented that a substantial portion of the investigation took place before the complaint was filed, when they analyzed software updates released by Defendants that were meant to address the defects; talked to consumers who had installed the updates to determine their efficacy; and ran diagnostic tests on affected laptops. Once the complaint was filed, Carlotti analyzed additional documentation provided by Defendants, including information on the remedial efforts Defendants had been undertaking. They retained an electrical engineering expert to review the technical documents. The parties represented that they exchanged a substantial amount of information outside of formal discovery procedures.

The court finds that the parties adequately investigated the claims and defenses in this case and that the parties had enough information to make an informed decision about settlement.

### 4. Experience and Views of Counsel

Carlotti is represented by counsel from Gutride Safier, LLP ("GSLLP") and Migliaccio & Rathod ("M&R"). Class counsel represents that they have no conflicts of interest with the class and have extensive experience and expertise in prosecuting complex class actions. Mot. at 21. Adam Gutride of GSLLP submitted a declaration in support of the motion for preliminary approval and attached a resume of the firm's cases. Gutride Decl., Ex. 2. GSLLP has been appointed as class

counsel in more than 25 consumer cases and has overseen more than a dozen large class action settlements. Gutride Decl. ¶ 13. Esfand Nafisi of M&R also submitted a declaration and attached the resumes of M&R attorneys, as well as a list of the notable consumer cases prosecuted by the firm. Nafisi Decl., Ex. 1.

The court is satisfied that class counsel have provided adequate representation on behalf of the class.

### 5. Government Participant

This factor is inapplicable because there is no government participant in this case. *See Mendoza v. Hyundai Motor Co., Ltd*, No. 15-cv-01685-BLF, 2017 WL 342059, at *7 (N.D. Cal. Jan. 23, 2017).

### 6. Reaction of Class Members

The reaction of the class members is best assessed at the final approval hearing since the court can look at how many class members submitted claim forms and objections. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (affirming approval of a class action settlement where there were 54 objections out of 376,301 notices sent). Therefore, this factor should not be considered in preliminary approval.

### B. Rule 23(e) Factors

Rule 23(e) requires the court to consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e).

//

12

### 1.  Adequacy of Representation

In determining whether to approve a class action settlement, a court must consider whether "the class representatives and class counsel have adequately represented the class."  Fed. R. Civ. P. 23(e)(2)(A).

### a.  Class Representative

Counsel states that Carlotti, as the class representative, has a "strong interest in proving Defendants' common course of conduct, and obtaining redress."  Mot. at 21; *see* Nafisi Decl. ¶ 4 (describing Carlotti's individual experience with Defendants' laptops and need for redress).  As described above, Carlotti's attorneys are experienced and competent, which is another indication that Carlotti has adequately represented the class.  *See In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.").  The court finds that this factor is satisfied.

### b.  Class Counsel

The experience of counsel is discussed in Section III.A.4, *supra*.

### 2.  Non-Collusive Negotiations

The Ninth Circuit "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution" in approving a class action settlement.  *Rodriguez*, 563 F.3d at 965.  Where a class has not yet been certified, a proposed settlement agreement "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."  *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).  "[T]he mere presence of a neutral mediator, though a factor weighing in favor of a finding of non-collusiveness, is not on its own dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement."  *Id.* at 948.

The Ninth Circuit has laid out three factors to consider when determining whether there are signs that class counsel "have allowed pursuit of their own self-interests . . . to infect negotiations."  *Bluetooth*, 654 F.3d at 947.  These are (1) "when counsel receive a disproportionate distribution of the settlement or when the class receives no monetary distribution but class counsel are amply

13

rewarded"; (2) when the payment of attorneys' fees is "separate and apart from class funds"; and (3) when the parties arrange for benefits that are not awarded to revert to the defendants rather than being added to the class fund. *Id.*

The first factor is not present here. Each class member may claim a monetary distribution as well as equipment repairs that would otherwise be costly. As addressed further in Section III.B.3, *infra*, the requested attorneys' fees appear to be within the range of a reasonable fee award. The court will address the exact amount of fees to be awarded in the order for final approval. At this stage, however, it does not appear that counsel will receive a disproportionate share of the settlement.

The second *Bluetooth* factor refers to a "clear sailing" arrangement, where the attorneys' fees are paid separately from the class fund, "which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class." *Bluetooth*, 654 F.3d at 947 (internal quotation marks omitted). There is a clear sailing provision in this case, as the settlement agreement states that Defendants will not oppose Plaintiff seeking fees up to $787,500.00. Agreement § 8.2. "[W]hen confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Bluetooth*, 654 F.3d at 948. This one warning sign is not necessarily enough to prove collusion, depending on the other indicia of arms-length negotiations present in the case. *See, e.g. Wilson v. Tesla, Inc.*, No. 17-cv-03763-JSC, 2019 WL 2929988, at *10 (N.D. Cal. July 8, 2019) (stating that other relevant considerations include the benefits to the class members and the extent of discovery and litigation). As examined further herein, the requested fees appear to be in a reasonable range relative to the recovery of the class, and the parties' litigation efforts are not indicative of collusion. Therefore, the second factor does not prohibit granting preliminary approval.

As for the third factor, there is no reversion clause in the Agreement, but the common fund operates in essentially the same way: namely, that Defendants will retain whatever money is not

claimed from the class fund. *See Bluetooth*, 654 F.3d at 947 (citing *Mirfasihi v. Fleet Mortg. Corp.*, 256 F.3d 781, 785 (7th Cir. 2004)). Considering the Agreement as a whole, including the amount offered in settlement and the expected efficacy of the notice, the common fund in this case is not indicative of collusion.

Accordingly, the Agreement "appears to be the product of serious, informed, non-collusive negotiations." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1078, 1079–80 (N.D. Cal. 2007).

### 3. Adequate Relief

In considering whether class relief is adequate, a court must consider:

> (i) the costs, risks, and delay of trial and appeal;
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3) . . .

Rule 23(e)(2)(C).

### a. Costs, Risks, and Delay of Trial and Appeal

The cost and risk of continued litigation is discussed in Section III.A.1, *supra*.

### b. Relief Distribution

Rule 23 requires the court to consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998). "[N]otice must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Tadepalli v. Uber Techs., Inc.*, No. 15-cv-04348-MEJ, 2016 WL 1622881, at *6 (N.D. Cal. Apr. 25, 2016) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

### i. Notice

Under the Agreement, notice will be provided to class members in numerous ways, including by email to class members for whom an email address is available; by postcard for those whom a physical mailing address is available; by both email and postcard if possible; published notice in

People magazine and USA Today; publication of an online notice on internet websites and social media platforms; publication on Defendants' websites and social media platforms, publication on Defendants' websites and social media platforms; and publication on a settlement website. Agreement ¶ 7.2. The notice program includes methods for trying alternate means of contacting class members if an email or mail is returned as undeliverable. For example, if mail is returned as undeliverable, then the claims administrator will use a skip trace search to identify updated addresses. *Id.* ¶ 7.2(e).

The claim administrator, Steven Weisbrot, testifies that this method is expected to reach 76.75% of the target audience with an average frequency of 3.03 times each, and that it is the best notice practicable. Weisbrot Decl. ¶¶ 22-23. Weisbrot's declaration lays out his experience in claims administration, including his involvement in designing and implementing "hundreds of court-approved notice and administration programs including some of the largest and most complex notice plans in history." Weisbrot Decl. ¶ 2. He also submitted quotes from other court orders recognizing the thoroughness of his work. *Id.* ¶ 6.

### ii.    Claim Rate

Initially, class counsel estimated that there will be between 3,000 and 4,000 claims submitted. Gutride Decl. ¶ 37; Nafisi Decl. ¶ 38. At the hearing, the court noted that the comparator cases submitted by Defendants were product labeling cases rather than large-purchase cases such as this one and requested additional information to support the expected claims rate. In the supplemental documentation, class counsel provided two additional comparator cases. In *In re: Arctic Sentinel, Inc. [f/k/a Fuhu, Inc.], et al.*, No. 15-css-12465 (Bankr. Del.) ("*Fuhu*"), GSLLP represented a class of individuals who had purchased an electronic tablet with alleged manufacturing defects. Supp. Br. at 10. There were 292,900 known class members in that case. *Id.* at 11; *see id.*, Ex. J ("Gerachi Decl.") ¶ 5. The claims administrator received 19,580 timely-filed claims for 21,153, of which 13,850 claims for 20,058 tablets were preliminarily determined to be valid. *Id.* ¶ 15. Therefore, the percentage of valid claims submitted in relation to the total class members in *Fuhu* was approximately 4.7%. Applying that figure in this case, the expected claims rate would be 1,166 claims submitted out of 24,800 class members. Class counsel notes that the claims rate in

16

*Fuhu* was higher (6.2%) for class members who received direct notice. The same percentage in this case would result in the submission of about 1,537 claims.

Carlotti argues that the claim rate in this case will likely be higher for several reasons. First, in *Fuhu*, the defendants did not have contact information for most of the purchasers, so only 15% of the class received direct notice. Supp. Br. at 11. In this case, by contrast, Defendants have the contact information for approximately 50% of the class. *Id.* Because direct notice seems more likely to result in a claim submission, the direct notice procedure in this case may theoretically result in a higher percentage of claims. *Id.* Second, Carlotti points out that the defendants in *Fuhu* did not have an active website that was frequented by purchasers. *Id.* Here, however, ASUS has "an active forum visited by Laptop purchasers," and so the notice published on ASUS's website will likely lead to a higher claim rate. *Id.* Third, Carlotti asserts the products in *Fuhu* were sold more than five years before the settlement was reached, so it was more likely that many consumers were no longer using the product. *Id.* at 12. In this case, the laptops at issue were sold in 2016 and 2017, which is more recent and therefore it is more likely that the products are still being used. *Id.* Finally, Carlotti notes that the maximum cash benefit ($30) in *Fuhu* was substantially smaller than the monetary benefits available in this case (up to $110 cash or a $210 credit certificate), so it is likely that fewer claimants were motivated to submit claims. *See id.*

Carlotti also cites *In re Lenovo Adware Litigation*, No. 15-md-2624-HSG (N.D. Cal), a case involving a software program that allegedly compromised consumer's personal information and degraded the computers' performance. Supp. Br. at 12. There, the claims rate was 10% across the entire class, and 17% of the class members who received direct notice. *Id.* at 13. Carlotti states that the claim rate in this case is likely to be lower. While the class members in *Lenovo* were not required to prove or aver that they experienced the defect, the class members in this case must attest under penalty of perjury that the laptop they purchased suffered from one or both defects. Because Defendants claim that the VS model has a 2% defect rate and the VSK model experienced a 0.5% defect rate, the number of class members eligible for relief is likely to be substantially lower than in *Lenovo*. *See* Supp. Br. at 14.

Based on these comparator cases, Carlotti revised the estimated claim rate to be between

17

1,000 and 2,000 claims, or approximately 4%-8% of the class members. *Id.* at 13. Given that the parties estimate that only a fraction of the class members experienced the defects and will be eligible for relief, the anticipated claim rate is reasonable in this case.

### iii. Claims Process

Another consideration is whether the claims process is burdensome to the class members. At the hearing, the court noted that the parties proposed using the same claims form for all Groups. Given that the parties have already identified the members of Group B, and those members are known to have purchased a laptop that suffered the defects, much of the information on the form (such as directions for submitting a proof of purchase) was extraneous for Group B. In their supplemental briefing, the parties developed a new claims form for members of Group B that is more direct and streamlined. Agreement, Ex. A1. With the modifications, the claims form for Group B is not unduly burdensome.

The court also raised a concern with respect to inspection demands. Under the Agreement, Defendants have the right to demand an inspection of a laptop for class members submitting a claim under Group A. Initially, the parties proposed an inspection period lasting up to 30 days, during which time the class member may have no access to their laptop. The court noted that requiring such an inspection may pose a barrier for class members to submit claims under Group A, if they did not want to be deprived of their laptop for that period of time. In order to remedy this concern, the parties revised the Agreement so that the inspection period is 20 days or less. They also added language to the claim form explaining that the purpose of the inspection is to prevent fraud. Members of Group A may exclude themselves from this requirement if they submit proof that they made a posting regarding the defects on Defendants' website prior to March 19, 2019. With the revisions, the court finds that the claims process for members of Groups A and C is reasonable.

In sum, the proposed method for distributing relief is adequate.

### c. Attorneys' Fees

"District courts must be skeptical of some settlement agreements put before them because they are presented with a bargain proffered for approval without benefit of an adversarial investigation." *Hanlon*, 150 F.3d at 1021 (internal quotations and citations omitted). "These

concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded." *Id.* "Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *Bluetooth*, 654 F.3d at 942 . The benchmark for a reasonable fee award as a percentage of the common fund is 25%. *Id.* Courts may also cross-check the amount by using both methods. *See Mendoza v. Hyundai Motor Co., Ltd*, No. 15-cv-01685-BLF, 2017 WL 342059, at *14 (N.D. Cal. Jan. 23, 2017). In this case, class counsel will request, and Defendants will not oppose, attorneys' fees and expenses of up to $787,500. Agreement, ¶ 8.1. The court will not award fees at the preliminary approval stage, so this order sets forth enough facts to evaluate whether the fee is reasonable on its face when compared to the settlement benefits.

Class counsel's lodestar is approximately $605,447.25. Gutride Decl. ¶¶ 23-25, 30-31; Nafisi Decl. ¶¶ 27-33. This includes attorneys' rates ranging from $550 to $1,025 per hour. Gutride Decl. ¶ 23-24; Nafisi Decl. ¶ 26. The requested award fee equates to a 1.28 multiplier. Factors to consider when evaluating this requested amount include whether the hours expended were reasonable; the fee rates are reasonable; and the requested multiplier is reasonable.[4] A fee rate of $1,025 initially appears quite high, although Plaintiff's counsel cites a case approving rates up to $950 per hour in 2016, and up to $975 per hour in 2015. Mot. at 28; *see also* Gutride Supp. Decl. ¶¶ 7-14 (citing recent opinions awarding counsel's 2017 and 2018 billing rates). Courts have also awarded multipliers of between 1 and 4. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6.

Using a percentage of the total recovery as a cross-check against this figure, class counsel argues that the requested fees amount to only 6.4-9.5% of the total settlement value, which Carlotti initially estimated at between $8.3 million and $11.97 million. Mot. at 33; Nafisi Decl. ¶ 19; *see*

---

[4] The lodestar figure may be adjusted upward or downward by positive or negative multiplier based on reasonableness factors including: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." *Graciano v. Robinson Ford Sales, Inc.*, 144 Cal. App. 4th 140, 154 (2006); *see also Ketchum v. Moses*, 24 Cal. 4th 1122, 1138 (2001) (upholding the lodestar enhancement predicated on contingency risk).

Section III.A.2, *supra*.  The revised estimate for the maximum total value of the Extended Warranty is $16,110,225.00.  Supp. Br. at 9; Morquecho Decl. ¶¶ 2-3.  Using that number and the highest estimate of the total monetary recovery, the maximum total value of the settlement is about $21.3 million.  Class counsel's lodestar is about 2.8% of this amount.  All of these percentages are well under the presumptively reasonable threshold of 25%.

The court notes that these calculations include the estimated value for the injunctive relief (repairs).  Courts may consider the value of injunctive relief but must be cautious that "its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund."  *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003).  Therefore, "only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees."  *Id.*  The Ninth Circuit has used the value of injunctive relief in estimating attorneys' fees where the agreement confers "a clearly measurable benefit."  *Id.* (citing *Hanlon*, 150 F.3d at 1029 (upholding the use of the common fund doctrine to award attorneys' fees where the settlement agreement included replacement of defective latches since the court could value the benefits conferred with "some degree of accuracy")).  In this case, the injunctive relief is the cost of repairing each laptop through replacing the motherboard and/or AC power adapter.  The value of the estimated repairs for a defective laptop can be accurately ascertained because the cost of parts and labor are fixed amounts that Defendants can and have readily determined.  *See* Morquecho Decl. ¶¶ 2-3.  Accordingly, it is appropriate to consider the value of injunctive relief in this case.

If the monetary value of the injunctive relief is not considered, then the estimated percentage of attorneys' fees substantially increases.  The "low" estimation of the monetary portion of the settlement benefits is $2.77 million, and the "high" estimation is $5.20 million.[5]  Mot. at 33; Nafisi Decl. ¶ 19.  Using the $2.77 million figure, the requested fees would be 28.4% (higher than the 25% threshold) while the percentage for the $5.20 million figure is 15.14% (lower than the 25%

---

[5] The lower figure assumes that every class member receives a $110 cash payment, while the higher figure assumes that each class member opts for the $210 credit certificate.  Nafisi Decl. ¶ 19.

threshold). However, even excluding the benefits conferred by the injunctive relief, it seems likely that the requested amount will fall within or at least close to the 25% threshold amount.

The court need not resolve the specific amount of attorneys' fees and costs at this stage, since such matters will be finally determined at the fairness hearing. The court finds the settlement agreement with respect to fees and costs is within the reasonable range of approval.

### 4. Equitable Treatment of Class Members

Carlotti asserts that the allocation plan treats class members equitably based on the relative strength of their claims. This is based on providing more benefit to class members who can substantiate their purchase of a laptop with proof while providing less benefit to class members who do not have proof of their purchase. Courts have approved settlement plans that pay monetary benefits based on the comparative strengths and weaknesses of certain claims. *See, e.g.*, *In re MyFord Touch Consumer Litig.*, No. 13-cv-03072-EMC (N.D. Cal. Mar. 28, 2019), ECF No. 526 at 4-5.

In this case, class members of Group A and B will receive the highest monetary benefit ($110 cash or a $210 credit certificate). These class members either have proof that they purchased their laptop or had previously complained about the defects. Members of Group C neither complained about the defects nor have a proof of purchase, and they can receive either a $55 cash payment or a $110 credit certificate. Given that members of Group C would face substantially more difficulty in recovering damages, the difference in recovery between the groups appears reasonable.

In sum, the Rule 23(e) factors weigh in favor of issuing preliminary approval.

### C. Northern District Guidelines

The Northern District of California has issued procedural guidance for the settlement of class actions ("Guidelines"). The court will consider them, although they do not carry the weight of law.

### 1. Identity of Settlement Class

The Guidelines require the parties to state "any differences between the settlement class and the class proposed in the operative complaint and an explanation as to why the differences are appropriate in the instant case." Guideline § 1(a).

The complaint defines the class and subclass as follows:

**The Class**
All persons in the United States who purchased one or more ASUS GL502VS or GL502VSK laptops

**The California Subclass**
All members of the Class who made their purchase in California.

The settlement class is defined as:

> [A]ll persons in the United States who purchased a new ASUS Rog Strix GL502VS or ASUS Rog Strix GL502VSK laptop computer from Defendants or an authorized retailer of Defendants between May 4, 2014 and the date Preliminary Approval is entered. Excluded from the Class are (a) the Honorable Magistrate Donna Ryu and any member of her immediate family; (b) any government entity; (c) Martin Quinn and any member of his immediate family; (d) Defendants; (e) any entity in which Defendants have a controlling interest; (f) any of Defendants' parents, affiliates, and officers, directors, employees, legal representatives, heirs, successors, or assigns; (g) any person whose purchase of a Laptop was for resale purposes; (h) any person who timely opts out of the Settlement; (i) any person who received a full refund of a Laptop's entire purchase price from ASUS or a retailer in connection with the Power Defect, Overheating Issue, or heat-related issues alleged in the Lawsuit; (j) any person who received a replacement Laptop that did not suffer from the Power Defect or Overheating Issue; and (k) any person who signed a release regarding their Laptop.

Agreement § 2.12.

The Agreement narrows the class definition in appropriate ways, for example, by excluding potential class members who may have a conflict, already received relief, or would otherwise be ineligible to claim a benefit (e.g., because they opted out). The settlement class also eliminates the subclass of California purchasers, but that change does not affect the total number of class members.

The court finds that the small differences in these definitions are reasonable and warranted.

### 2. Release of Claims

The Guidelines require the court to look at "any differences between the claims to be released and the claims certified for class treatment and an explanation as to why the differences are appropriate in the instant case." Guideline § 1(d). The release provision in the Agreement provides:

> As of the Effective Date, the Class Representative and Settlement Class Members hereby expressly fully release and forever discharge the Released Parties and further expressly agree that they shall not now or thereafter institute, maintain, or assert against the Released Parties, either directly or indirectly, on their own behalf or on behalf of any class or other person or

> entity, in any action, regulatory action, arbitration, or court or other proceeding of any kind, any causes of action, claims, damages, equitable, legal and administrative relief, interest, demands, rights, or remedies, including, without limitation, claims for injunctive relief, declaratory relief, damages, mental anguish, unpaid costs, penalties, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, disgorgement, or equitable relief against the Released Parties, whether based on federal, state, or local law, statute, ordinance, regulation, constitution, contract, common law, or any other source, that relate to the Released Claims.

Agreement ¶ 10.1. The release does not extend to any claims of personal injury allegedly arising out of the use of the laptops, nor does it prevent class members from enforcing the terms of the Agreement. While broad, the release relates only to the allegations in the complaint and the factual basis for the claims.

The court finds that the release is sufficiently tailored to the allegations in the complaint.

### 3. Class Recovery

The Guidelines require parties to explain "[t]he anticipated class recovery under the settlement, the potential class recovery if plaintiffs had fully prevailed on each of their claims, and an explanation of the factors bearing on the amount of the compromise." Guideline § 1(e).

The class recovery is examined in Section III.A.2, *supra*.

### 4. Allocation Plan

The parties should explain "the proposed allocation plan for the settlement fund." Guideline § 1(f). The allocation plan is detailed in Sections III.A.2 and III.B.3, *supra*.

### 5. Submission of Claim Forms

If there is a claim form, the parties should provide "an estimate of the number and/or percentage of class members who are expected to submit a claim in light of the experience of the selected claims administrator and/or counsel from other recent settlements of similar cases, the identity of the examples used for the estimate, and the reason for the selection of those examples." Guideline § 1(g).

This factor is considered in Sections III.A.2 and III.B.3, *supra*.

### 6. Reversions

"[I]n light of Ninth Circuit case law disfavoring reversions," the parties should state

"whether and under what circumstances money originally designated for class recovery will revert to any defendant, the potential amount or range of amounts of any such reversion, and an explanation as to why a reversion is appropriate in the instant case."  Guideline § 1(h).

As discussed in Section III.B.2, *supra*, the common fund in this case has the same effect as a reversion.  While this factor weighs against granting preliminary approval, the class benefits and notice procedures alleviate the concerns implicated by reversions.

### 7.  Settlement Administration

"In the motion for preliminary approval, the parties should identify the proposed settlement administrator, the settlement administrator selection process, how many settlement administrators submitted proposals, what methods of notice and claims payment were proposed, and the lead class counsel's firms' history of engagements with the settlement administrator over the last two years. The parties should also address the anticipated administrative costs, the reasonableness of those costs in relation to the value of the settlement, and who will pay the costs."  Guideline § 2.

In his declaration, Gutride explains the process they used to select Angeion Group as the claims administrator:

> The proposed settlement administrator is Angeion Group. Defendants are bearing the costs of claims administration and they selected the administrator without input from Plaintiff.  Nevertheless, GSLLP has worked with Angeion Group in the past as it administered the Deoleo olive oil settlement (*Koller v. Med Foods, Inc.*, Case 3:14-cv-02400-RS) involving my firm.  My partner Ms. McCrary spoke to Steven Weisbrot, the principal at Angeion Group who will be responsible for administering this settlement, about the plan to provide notice and to ensure a robust claims rate. Based on Ms. McCrary's conversation and on the experience of GSLLP, I believe that Angeion will adequately and professionally discharge its duties as settlement administrator.

Gutride Decl. ¶ 36.

Based on these representations, the appointment of Angeion Group is appropriate in this case.

### 8.  Notice

"The parties should ensure that the class notice is easily understandable, taking into account any special concerns about the education level or language needs of the class members."  Guideline

§ 3.  The Guidelines list certain information that should appear in the notice, such as (1) contact information for class counsel; (2) website address for the settlement site; and (3) information on how to access the case docket on PACER.  In addition, "[t]he notice distribution plan should rely on U.S. mail, email, and/or social media as appropriate to achieve the best notice that is practicable under the circumstances, consistent with Federal Rule of Civil Procedure 23(c)(2)."  Guideline § 3.  The notice process is outlined in further detail above.

The information required by Guideline § 3 is listed in the proposed long form notice and email notice.  The postcard notice does not contain this information, but does direct the reader to Defendants' website, which contains the long form notice.  Based on its review of the class notices and the notice distribution plan, examined in more detail in Section III.B.3, *supra*, the court finds that the class notice in this case is accessible and appropriate.

### 9.    Opt-Outs

"The notice should instruct class members who wish to opt out of the settlement to send a letter, setting forth their name and information needed to be properly identified and to opt out of the settlement, to the settlement administrator and/or the person or entity designated to receive opt outs.  It should require only the information needed to opt out of the settlement and no extraneous information. The notice should clearly advise class members of the deadline, methods to opt out, and the consequences of opting out."  Guideline § 4.

The proposed long form notice contains all the instructions required by Guideline § 4, and the other notices (e.g., email and postcard) refer the reader to the website, which contains the long form notice.  The court finds that the opt-out procedure available here is reasonable.

### 10.    Objections

"The notice should instruct class members who wish to object to the settlement to send their written objections only to the court. All objections will be scanned into the electronic case docket and the parties will receive electronic notices of filings. The notice should make clear that the court can only approve or deny the settlement and cannot change the terms of the settlement. The notice should clearly advise class members of the deadline for submission of any objections."  Guideline § 5.

The proposed long form notice has all the information required by Guideline § 5. Each of the other notice forms has the objection date noted and refers the reader to the website to read the requirements for objecting.

The objection process proposed in this case satisfies the requirements of Guideline § 5.

### 11. Attorneys' Fees

The requested fee award is examined in Section III.B.3, *supra*.

### 12. Incentive Awards

After the class is notified and has the opportunity to object, Carlotti intends to request, and Defendants will not oppose, an incentive award of $5,000 to Carlotti, the class representative. Agreement § 7.1. "The request of $5,000 is reasonable as that amount is the presumptive incentive award in [the Northern District of California]." *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 17-md-02777-EMC, 2019 WL 536661, at *9 (N.D. Cal. Feb. 11, 2019).

The incentive award requested is presumptively reasonable and there are no considerations at this time that would warrant a lower award.

### 13. CAFA Notice

"The parties should address whether CAFA notice is required and, if so, when it will be given." Guidelines § 10.

The Agreement provides that "[t]he Claim Administrator shall serve notice of this Settlement to appropriate state and federal officials pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715. The Claim Administrator shall be responsible for drafting and preparing the notice in conformity with 28 U.S.C. § 1715 and for identifying the appropriate state and federal officials to be notified." Agreement § 7.2.

### 14. Past Distributions

The Guidelines provide that "[l]ead class counsel should provide the following information for at least one of their past comparable class settlements (i.e. settlements involving the same or similar clients, claims, and/or issues)":

      a. The total settlement fund, the total number of class members, the total

> number of class members to whom notice was sent, the method(s) of notice, the number and percentage of claim forms submitted, the average recovery per class member or claimant, the amounts distributed to each cy pres recipient, the administrative costs, and the attorneys' fees and costs.
>
> b.   In addition to the above information, where class members are entitled to non-monetary relief, such as discount coupons or debit cards or similar instruments, the number of class members availing themselves of such relief and the aggregate value redeemed by the class members and/or by any assignees or transferees of the class members' interests. Where injunctive and/or other non-monetary relief has been obtained, discuss the benefit conferred on the class.

Guidelines ¶ 11.  "Counsel should summarize this information in easy-to-read charts that allow for quick comparisons with other cases."  *Id.*  The comparator cases submitted by Carlotti are discussed in Section III.B.3, *supra*.

In sum, the court finds that preliminary approval is warranted in this case.

## IV.   PROVISIONAL CLASS CERTIFICATION

"The criteria for class certification are applied differently in litigation classes and settlement classes.  In deciding whether to certify a litigation class, a district court must be concerned with manageability at trial.  However, such manageability is not a concern in certifying a settlement class where, by definition, there will be no trial.  On the other hand, in deciding whether to certify a settlement class, a district court must give heightened attention to the definition of the class or subclasses."  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556–57 (9th Cir. 2019).  "[T]he aspects of Rule 23(a) and (b) that are important to certifying a settlement class are those designed to protect absentees by blocking unwarranted or overbroad class definitions.  The focus is on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives."  *Id.* at 558.

### A.   Rule 23(a)

Rule 23(a) provides that a class action is proper only if four requirements are met: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a)(1)-(4).

#### 1.   Numerosity

Rule 23(a)(1) requires the class to be 'so numerous that joinder of all parties is

27

impracticable.'" *Volkswagen*, 2017 WL 672820, at *6, 2017 U.S. Dist. LEXIS 22775, at *737 (quoting Rule 23(a)(1)). "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members, but not satisfied when membership dips below 21." *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal 2000).

Here, the proposed class consists of about 24,800 consumers. *See* Nafisi Decl. ¶ 19. Accordingly, numerosity is established.

### 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, Carlotti argues that the class members' claims "arise from a common nucleus of facts and are based on the same legal theories." Mot. at 19. This is because the laptops suffer from a "common Power Defect and Overheating Issue" and because "Defendants uniformly misrepresented their Laptops by failing to disclose these material facts." *Id.* They also assert that all claims are brought under legal theories common to the class as a whole. *Id.* at 20. At the hearing, the parties represented that the Power Defect can be substantially resolved through the offered repairs, which suggests that the cause of that defect is common to the class members. In addition, the alleged advertising misrepresentations are likely common to the class as a whole because advertising is generally targeted to a large population.

The court finds that the common questions of law and fact in this case support provisional class certification.

### 3. Typicality

Under Rule 23(a)(3), the claims of the representative parties must be "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). "Typicality 'assure[s] that the interest of the named representative aligns with the interests of the class.'" *Volkswagen*, 2017 WL 672820, at *7, 2017 U.S. Dist. LEXIS 22775, at *739.

Carlotti's individual claims "arise out of the alleged misrepresentations of the Laptops' performance and cooling capabilities." Mot. at 20. These are precisely the claims asserted on behalf of the class. In addition, as discussed above, the alleged defects appear to stem from a common issue since they are susceptible to the same remedy.

The court holds that the typicality requirement is satisfied for the purpose of provisional certification.

### 4.    Adequacy

Finally, Rule 23(a)(4) requires that the named plaintiffs, who seek to be class representatives, "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts engage in a dual inquiry to determine adequate representation and ask: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Volkswagen*, 2017 WL 672820, at *7, 2017 U.S. Dist. LEXIS 22775, at *740-41.

This factor is addressed in Sections III.A.4 and III.B.1, *supra*, and is satisfied for the purposes of provisional approval.

### B.    Rule 23(b)(e)

In addition to meeting the prerequisites of Rule 23(a), Carlotti must also meet one of the three requirements of Rule 23(b) to certify the proposed class. Carlotti seeks certification of the class under Rule 23(b)(3), which states that a class action may be maintained if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3). Certification under Rule 23(b)(3) is appropriate "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon*, 150 F.3d at 1022 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1777 (2d ed. 1986)).

### 1.    Predominance

Rule 23(b)(3) lists four non-exclusive factors "pertinent" to a predominance finding:

> (A) the class members' interests in individually controlling the prosecution

29

or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

The Ninth Circuit has noted that predominance is "readily met" in cases alleging consumer fraud.

*In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 559 (9th Cir. 2019)

The common questions in this case, as laid out in Section IV.A.2, *supra*, predominate over any individual issues that might exist. The claims raised in this case regard two specific defects as applied to two specific laptop brands. The claims asserted are brought under legal theories that apply to the class as a whole. The affected laptops can be identified and repaired in a uniform manner. The class members do not have a strong interest in bringing individual cases, as the maximum amount of recovery for an individual class member would likely be a fraction of the cost of bringing a lawsuit. There are a significant number of common issues and no apparent individual issues.

For the purposes of provisional certification, the predominance factor is met.

### 2. Superiority

The superiority requirement focuses on "whether maintenance of [the] litigation as a class action is efficient and whether it is fair." *Volkswagen*, 2017 WL 672820, at *8. "[M]anageability of a class action for purposes of Rule 23(b)(3) is not an issue in the settlement context because the case will not be tried." 2019 WL 536661, at *7.

Here, the proposed class contains approximately 24,800 individuals. Where each class member bringing an individual suit "would be required to prove the same wrongful conduct to establish liability and thus would offer the same evidence, . . . classwide resolution of their claims is clearly favored over other means of adjudication." *Volkswagen*, 2017 WL 672820, at *8. As discussed further above, the range of issues (two defects applying to two laptop brands) is limited and individual cases addressing these issues would likely address the same wrongful conduct and use the same supporting evidence.

The proposed class meets the superiority requirement. Accordingly, provisional certification

of the class for settlement purposes is warranted in this case.

**V. CONCLUSION**

For the reasons stated above, the motion for preliminary approval is granted. It is ordered that:

1. The Agreement is preliminarily approved as fair, adequate, and reasonable pursuant to Rule 23(e).

2. The proposed Settlement Class is conditionally certified pursuant to Rule 23(a) and (b)(3) for the purposes of settlement.

3. Plaintiff Joseph Carlotti is appointed to serve as Class Representative for the Class.

4. The law firms of Gutride Safier LLP and Miglaccio & Rathod LLP are appointed to serve as Class Counsel.

5. Angeion Group is appointed as the Claim Administrator.

6. The proposed claim forms and forms of notice are approved as to form and content. The parties shall have discretion to jointly make non-material minor revisions to the claim forms or the class notices. Responsibility regarding settlement administration, including, but not limited to, notice and related procedures, shall be performed by the Claim Administrator, subject to the oversight of the parties and this court as described in the Agreement. The costs of providing notice to the Class members and for administering the settlement shall be borne by ASUS, as provided in the Agreement. All Class Members who wish to submit a claim must do so in the manner specified in the Agreement by **April 3, 2020**.

7. The procedures for Class Members to exclude themselves from or object to the Agreement are approved. Any request for exclusion by a Class Member must be postmarked or submitted electronically on the settlement website by **April 3, 2020**, and in compliance with the terms of the Agreement. Any objection by a Class Member must be filed with the court by **April 3, 2020**, and in compliance with the terms of the Agreement.

8. Class Counsel shall file a list of Class Members who have requested exclusion from the Settlement in a valid and timely manner by **April 17, 2020**.

9.      The Claim Administrator shall provide a declaration attesting to its compliance with the Notice obligations set forth herein and the Agreement by **April 17, 2020**. The declaration shall include: the total number of Class Members; a sample copy of the Class Notice; the process by which ASUS provided a list of Class Member information to the Claim Administrator for sending Email Notice and Postcard Notice; the number of Email Notices emailed and Postcard Notices mailed and the range of dates within which such Notices were sent; and the number of Postcard Notices returned to the Claim Administrator by the United States Postal Service.

10.     The parties shall file any memoranda or other materials in support of final approval of the Agreement, including in response to any timely and valid objection to the Agreement, no later than **April 17, 2020**.  Such materials shall be served on Class Counsel, Defendants' counsel, and on any member of the Class (or their counsel, if represented by counsel) to whose objection to the Agreement the memoranda or other materials respond.

11.     Plaintiff's claims against Defendants are hereby stayed.

12.     Pending final determination of whether the Settlement should be approved, Plaintiff and each Class Member, and any person purportedly acting on behalf of any Class Member(s), are hereby enjoined from commencing, pursuing, maintaining, enforcing, or proceeding, either directly or indirectly, any Released Claims in any judicial, administrative, arbitral, or other forum, against any of the Released Parties, provided that this injunction shall not apply to the claims of Class members who have timely and validly requested to be excluded from the Class. This injunction will remain in force until the Effective Date or until such time as the parties notify the court that the Agreement has been terminated.

13.     In the event that the proposed Agreement is not finally approved by the court, or in the event that the Agreement becomes null and void or terminates pursuant to its terms, this order and all orders entered in connection herewith shall become null and void, shall be of no further force and effect, and shall not be used or referred to for any purposes whatsoever in this litigation or in any other case or controversy, in such event the Agreement and all negotiations and proceedings directly related thereto shall be deemed to be without prejudice to the rights of any and all of the

parties, who shall be restored to their respective positions as of the date and time immediately preceding the execution of the Agreement

14. Counsel for the parties are hereby authorized to utilize all reasonable procedures in connection with the administration of the Agreement which are not materially inconsistent with either this order or the terms of the Agreement.

The following deadlines shall apply:

| | |
|---|---|
| Deadline for Defendants to provide class list to Class Counsel | December 6, 2019 |
| Initial date for commencing Notice program | January 10, 2020 |
| Deadline for Class Members to submit objections/requests for exclusion | April 3, 2020 |
| Deadline for Class Members to submit claim forms | April 3, 2020 |
| Deadline for Class Counsel to file a list of exclusions | April 17, 2020 |
| Deadline for Claim Administrator to file declaration with the court | April 17, 2020 |
| Deadline for Class Counsel to reply to objections | April 17, 2020 |
| Deadline for Class Counsel to file motion for final approval | April 17, 2020 |
| Final approval hearing | April 30, 2020 at 1:00 p.m. |

**IT IS SO ORDERED.**

Dated: November 19, 2019



_____
Donna M. Ryu
United States Magistrate Judge